IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

JAY HESTIR                                                                            PLAINTIFF


v.                                  Case No. 4:19-cv-00067-LPR


USAble Life                                                                          DEFENDANT


## ORDER

On January 29, 2019, Plaintiff Jay Hestir filed a Complaint in the Eastern District of Arkansas.[1]  Mr. Hestir is seeking long term disability benefits pursuant to sections 502(a)(e)(1) and (f) of the Employee Retirement Income Security Act of 1974 ("ERISA").[2]  On March 8, 2019, Defendant USAble Life filed an Answer.[3]  In ERISA cases, trials are not necessary because a court's review is limited to a review of the record made before the administrator of a plan. Accordingly, the parties have filed a Joint Stipulated Record.[4]

On July 22, 2019, Mr. Hestir filed a Brief and Motion for Judgment on the Record.[5]  The Motion argues that Mr. Hestir is entitled to judgment on the record because Mr. Hestir "meets the Plan definition of disability and USAble ignored evidence which supported his claim."[6]  On August 22, 2019, USAble filed a Response and Counter Motion for Judgment on the Record.[7]

---

[1]   Compl. (Doc. 1).

[2]   *Id.* ¶ 1.  The Employee Retirement Income Security Act of 1974 is codified at 29 U.S.C. § 1001 *et seq.*

[3]   Def.'s Answer (Doc. 2).

[4]   Joint Stipulated R. (Doc. 26).

[5]   Pl.'s Br. and Mot. for J. on the R. (Doc. 30) at 8.

[6]   *Id.*

[7]   Def.'s Resp. and Counter Mot. for J. on the R. (Doc. 35).

USAble asserts that its decision to deny Mr. Hestir long term benefits was reasonable and based on substantial evidence.[8]  On August 30, 2019, Mr. Hestir filed a Reply.[9]  For the following reasons, the Court will DENY Mr. Hestir's Motion and GRANT USAble's Counter Motion.

## BACKGROUND AND RELEVANT FACTS

Mr. Hestir's Application for Long Term Disability Income Benefits was dated December 11, 2016 and file marked received by USAble on December 15, 2016.[10]  The application indicates that Mr. Hestir is seeking benefits because of an injury he sustained while he was showering in December 2015.[11]  According to the application, Mr. Hestir dislocated his shoulder while he was washing his back, resulting in torn tendons in his shoulder.[12]  Mr. Hestir initially continued to work despite the injury.  But his arm and shoulder movement became significantly restricted.[13]  On June 18, 2016, Mr. Hestir worked his last day for his long-time employer, Arkansas Blue Cross and Blue Shield.[14]

The Court summarizes the parties' Joint Stipulated Record.  First, the Court will discuss the job that Mr. Hestir held immediately prior to alleging his disability.  Next, the Court will describe Mr. Hestir's injury and note the relevant medical reports and findings.  Finally, the Court will discuss the relevant parts of Mr. Hestir's long-term disability plan (the "Plan") and USAble's repeated decisions to deny Mr. Hestir's claim for benefits.

---

[8]   Def.'s Resp. and Counter Mot. for J. on the R. (Doc. 35) at 6.

[9]   Pl.'s Reply (Doc. 36).

[10]   Part 3 of Joint Stipulated R. (Doc. 26-3) at 70.

[11]   *Id.*

[12]   *Id.*

[13]   *Id.*

[14]   Part 8 of Joint Stipulated R. (Doc. 26-8) at 31.

## I.      Mr. Hestir's Job and Duties

Mr. Hestir worked for Arkansas Blue Cross and Blue Shield from January 1996 until December 2016.[15]  During his final two-and-a-half years of work, Mr. Hestir held the position of Production Control Analyst III ("Analyst III").[16]  According to Mr. Hestir, his normal day involved monitoring main frame computer systems, doing job requests, tracking down problems for aborted systems, resolving issues, calling for assistance, and other related activities.[17]  In a normal eight-hour day, Mr. Hestir estimated that he was required to walk for fifteen minutes, stand for fifteen minutes, sit for six-and-a-half hours, and crouch for fifteen minutes to perform his job.[18]  He also estimated that his job required him to handle objects for two hours a day, reach for six hours a day, and write or handle small objects for six hours a day.[19]  According to Mr. Hestir, he frequently had to lift objects weighing less than ten pounds.[20]  And he was sometimes required to lift and carry binders and instruction manuals weighting fifteen to twenty pounds.  The most he was ever required to lift was twenty pounds.[21]

Mr. Hestir's supervisor corroborated much of Mr. Hestir's job description.[22]  According to Mr. Hestir's supervisor, an Analyst III's work consisted of eighty-percent typing on a computer and twenty-percent answering calls.[23]  Mr. Hestir's supervisor explained that an Analyst III was

---

[15]   Part 2 of Joint Stipulated R. (Doc. 26-2) at 29.

[16]   Part 8 of Joint Stipulated R. (Doc. 26-8) at 32.

[17]   Part 2 of Joint Stipulated R. (Doc. 26-2) at 35.

[18]   *Id.*

[19]   *Id.*

[20]   *Id.*

[21]   *Id.*

[22]   Part 8 of Joint Stipulated R. (Doc. 26-8) at 32.

[23]   *Id.*

required to sit and keyboard (type) for the majority of the day.[24]   And an Analyst III was only occasionally required to stand, walk, or reach overhead.  But contrary to Mr. Hestir's description, Mr. Hestir's supervisor originally indicated that an Analyst III was never required to lift or carry (or push or pull) any weight to perform the job.[25]   Almost a year later, Mr. Hestir's supervisor revised his position on lifting and carrying to include routinely lifting and carrying a "lockbox of tape(s)" weighing less than three pounds.[26]   A Human Resources description of the Analyst III position is also included in the record.[27]

On January 13, 2017, USAble referred Mr. Hestir's file to Vocational Consultant Teresa Marques.[28]   The reason for this initial referral was for Ms. Marques to "identify Mr. Hestir's occupation, the material & substantial duties/essential functions and how it is normally/routinely performed in the national economy."[29]   Based on the various descriptions of Mr. Hestir's job, Ms. Marques determined that an Analyst III is most closely related to a Systems Analyst under the Dictionary of Occupational Titles ("DOT").[30]   According to the DOT, a Systems Analyst's work "is performed at the sedentary physical demand level." [31]   Thus, Ms. Marques reasoned that in order to perform an Analyst III's material and substantial duties, Mr. Hestir must be able to sit, stand, frequently finger (type) and handle, and occasionally reach at desk level.[32]   He may also

---

[24]   *Id.*

[25]   *Id.*

[26]   *Id.* at 38.

[27]   *Id.* at 19-20.

[28]   Part 16 of Joint Stipulated R. (Doc. 26-16) at 11.

[29]   *Id.*

[30]   *Id.* at 12.

[31]   *Id.*

[32]   *Id.* at 13.

have to occasionally lift, carry, push, or pull up to ten pounds.[33]

On October 18, 2017, Mr. Hestir's file was re-referred to Ms. Marques.[34]  This time, Ms. Marques was asked to determine if her prior assessment was still accurate in light of developments in the file.[35]  Specifically, Ms. Marques noted that Mr. Hestir claimed that his position required him to lift twenty-pound instruction manuals and binders.  Ms. Marques concluded that her original assessment remained accurate, and that to the extent Mr. Hestir was required to lift twenty pounds, such a requirement was "unique to the job and is not typical of how the occupation is normally performed in the National Economy."[36]

On January 24, 2018, Mr. Hestir's file was referred to Ms. Marques a final time.[37]  The purpose of this final referral was for Ms. Marques to opine as to whether the demands of Mr. Hestir's occupation were "consistent with his current physical capacities . . . ."[38]  Based on the physical limitations that she was provided—which were largely consistent with the limitations described by Mr. Hestir's orthopedic surgeon—Ms. Marques concluded that the demands of Mr. Hestir's occupation were consistent with his current physical capabilities.[39]

On February 13, 2018, Mr. Hestir hired his own Vocational Specialist to opine as to

---

[33]  *Id.*

[34]  Part 8 of Joint Stipulated R, (Doc. 26-8) at 65.

[35]  *Id.*

[36]  *Id.* at 67.

[37]  Part 5 of Joint Stipulated R. (Doc. 26-5) at 38.

[38]  *Id.*

[39]  *Id.*; s*ee also* Part 1 of Joint Stipulated R. (Doc. 26-1) at 53-56.  The limitations described by Mr. Hestir's orthopedic surgeon will be discussed *infra*.  Ms. Marques was to assume that Mr. Hestir had "no restrictions on bilateral fingering and handling, left above shoulder reaching, sitting, standing and walking; left lifting up to 100 lbs.; frequent 10 lbs. bilateral lifting; occasional right reaching (below shoulder level/forward for objects on desktop or workstations) and avoiding right lifting/carrying more than 10 lbs. and right above shoulder reaching."  Part 5 of Joint Stipulated R. (Doc. 26-5) at 38.

whether Mr. Hestir could perform "the essential job functions of his past work."[40]  Mr. Hestir's Vocational Specialist, Robert White, agreed with Ms. Marques's conclusion that an Analyst III is most closely related to a Systems Analyst under the DOT.[41]  But Mr. White disagreed with Ms. Marques's ultimate determination that Mr. Hestir could perform sedentary work.  Mr. White based his determination on his own assessment of Mr. Hestir and on the opinion of Mr. Hestir's primary care physician.

### II.    Mr. Hestir's Injury

As noted above, Mr. Hestir's December 2015 shoulder injury is the reason that he stopped working and applied for long-term disability.[42]  Indeed, Mr. Hestir specifically stated that he was unable to work because "torn tendons restricted [his] arm and shoulder movements."[43]  The record reveals that in 1980 Mr. Hestir was diagnosed with congenital dislocation of his right shoulder.[44] He underwent two shoulder surgeries in the early 2000s,[45] and then underwent a subtotal repair of his right rotator cuff on June 20, 2016.[46]  Before this most recent surgery, but after the December 2015 shoulder injury, Mr. Hestir was examined by Dr. David Collins, an orthopedic specialist.  It was Dr. Collins's opinion that Mr. Hesitr's primary issue was pain, and that Mr. Hestir was "really not lacking functionality . . . except by the element of pain."[47]  Medical records from after the December 2015 shoulder injury revealed that Mr. Hestir's shoulder pain could be managed with

---

[40]   *Id.* at 9.

[41]   *Id.* at 6.

[42]   Part 3 of Joint Stipulated R. (Doc. 26-3) at 70.

[43]   *Id.*

[44]   Part 6 of Joint Stipulated R. (Doc. 26-6) at 94.

[45]   *Id.*

[46]   Part 12 of Joint Stipulated R. (Doc. 26-12) at 62.  The surgery took place two days after Mr. Hestir's last day of work.  Part 3 of Joint Stipulated R. (Doc. 26-3) at 70.

[47]   Part 12 of Joint Stipulated R. (Doc. 26-12) at 60.

steroid injections.[48]  But Mr. Hestir nevertheless elected to proceed with the surgery.

Three weeks after the surgery, Dr. Collins observed signs of an "early acceptable outcome."[49]  At the six-week mark, Dr. Collins stated that the prognosis was "fair" and that Mr. Hestir would benefit from rehabilitation.[50]  Twelve weeks after surgery, Dr. Collins reported that Mr. Hestir's "progress is excellent at this point."[51]  At the four-month mark, Dr. Collins stated that Mr. Hestir was "making improvement on a steady basis" and that there was "no reason that [Mr. Hestir] could not return" to his job.[52]  Dr. Collins also noted for the first time what he perceived to be an "inten[t]ion tremor."[53]  Finally, nearly six months after the surgery, Dr. Collins opined that Mr. Hestir had "a fair outcome" and "may continue to improve with time."[54]  But Dr. Collins cautioned that Mr. Hestir's desk job could prove challenging if it required "significant bimanual activities with the arms away from the body."[55]  To the greatest extent possible, Dr. Collins recommended that Mr. Hestir "keep his arms at his side" and stick to working with a "p[e]n, pencil, keyboard or mouse."[56]

Between follow-up appointments with Dr. Collins, Mr. Hestir attended physical therapy. His initial assessment was conducted on June 21, 2016.[57]  At that time, Mr. Hestir reported his

---

[48]   *Id.* at 106.

[49]   Part 1 of Joint Stipulated R. (Doc. 26-1) at 65.

[50]   *Id.* at 67.

[51]   *Id.* at 69.

[52]   *Id.* at 71.

[53]   *Id.*  Dr. Collins noted that Mr. Hestir had a history of cervical spine issues that were possibly related to the tremor. *Id.*  Dr. Collins referred Mr. Hestir to a neurologist, which is discussed *infra*. *Id.*

[54]   *Id.* at 73.

[55]   *Id.*

[56]   *Id.*

[57]   Part 6 of Joint Stipulated R. (Doc. 26-6) at 12.

pain at 10/10 on the pain scale.[58]  But Mr. Hestir also indicated that his pain was manageable with medication.[59]  The therapist noted that Mr. Hestir enjoyed "full elbow, wrist and digit active rage of motion with minimal limitation."[60]  Mr. Hestir's initial assessment revealed that he had a "moderate impairment."[61]  The therapist concluded that Mr. Hestir was "a great candidate for formal therapy to restore full mobility and function."[62]

On June 23, 2016, Mr. Hestir reported already feeling better.[63]  His therapist noted that his passive mobility had "improved nicely."[64]  On August 12, 2016, Mr. Hestir demonstrated "good global mobility" and stated that he was heading up to Heber Springs for the first time since his surgery.[65]  On August 19, 2016, Mr. Hestir was surprised that his therapy the previous week did not cause a significant increase in soreness.[66]  The therapist noted that he demonstrated good independence despite experiencing a tremor, which he was able to get under control.[67]  On August 30, 2016, Mr. Hestir reported minimal pain and was "able to raise his arm independently surprisingly well."[68]  On September 1, 2016, Mr. Hestir's pain had dropped to 4/10.[69]  The therapist reported that Mr. Hestir was making "functional gains."[70]

---

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.* at 13.

[62] *Id.*

[63] *Id.* at 8.

[64] *Id.*

[65] Part 12 of Joint Stipulated R. (Doc. 26-12) at 84.

[66] Part 6 of Joint Stipulated R. (Doc. 26-6) at 37.

[67] *Id.*

[68] *Id.* at 32.

[69] *Id.* at 29.

[70] *Id.*

On September 8, 2016, Mr. Hestir's pain was back up to 5/10 "with activity."[71]   But the therapist reported that Mr. Hestir tolerated treatment well, had a good active range of motion, and had "made good gains."[72]   On September 20, 2016, Mr. Hestir reported "being very active last week caring for his brother's animals," which required him to carry "large bags of food and buckets of water."[73]   According to Mr. Hestir, he "felt like he was making good progress."[74]   On September 22, 2016, Mr. Hestir reported that his shoulder was "finally feeling better."[75]   Mr. Hestir attended his final therapy session on September 27, 2016.[76]   Despite reduced pain and clear weekly progress, Mr. Hestir scored worse on his final assessment than he had scored on his initial assessment— although both scores fell within the rage of a "moderate impairment."[77]

On January 20, 2017, Dr. Collins submitted an "Attending Physician's Statement of Functionality."[78]   The statement came a little more than six months after Dr. Collins performed Mr. Hestir's surgery.   Dr. Collins indicated that Mr. Hestir had no restrictions against sitting, standing, or walking for eight hours a day.[79]   He further opined that Mr. Hestir had no restrictions against lifting up to ten pounds with either arm, but that Mr. Hestir could never reach above the shoulder with his right arm and could only occasionally kneel, crouch, and reach below the shoulder with his right arm.[80]   Dr. Collins stated that Mr. Hestir had no limitations fingering

---

[71]   *Id.* at 25.

[72]   *Id.* at 26.

[73]   Part 5 of Joint Stipulated R. (Doc. 26-5) at 94.

[74]   *Id.*

[75]   *Id.* at 92.

[76]   Part 6 of Joint Stipulated R. (Doc. 26-6) at 1.

[77]   *Id.*

[78]   Part 1 of Joint Stipulated R. (Doc. 26-1) at 53-56.

[79]   *Id.* at 54.

[80]   *Id.*

(typing) or handling with either hand and that Mr. Hestir was improving.[81]

Mr. Hestir's primary care physician, Dr. Michael Berry, also submitted an "Attending Physician's Statement of Functionality."[82]  He concluded that Mr. Hestir's limitations were far more severe than Dr. Collins.  Specifically, Dr. Berry concluded that Mr. Hestir could not sit for more than two hours a day and could not stand or walk more than one hour a day.[83]  Dr. Berry further opined that Mr. Hestir could occasionally lift up to ten pounds bilaterally and up to twenty pounds with his right arm.[84]  Dr. Berry indicated that Mr. Hestir could not reach overhead with either arm, only occasionally reach below the shoulder with his right arm, and only occasionally finger and handle with his right hand.[85]  However, it is worth noting that Dr. Berry stated that Mr. Hestir's condition had not changed in the past five years and that he was only treating Mr. Hestir every three months.  Dr. Berry also stated that he expected the limitations he identified to only last for one year from Mr. Hestir's alleged date of disability.[86]  But a few months later, Dr. Berry described Mr. Hestir as having reached "maximal medical improvement."[87]  In a letter dated June 7, 2017, Dr. Berry opined that Mr. Hestir could not perform his job because his injuries prevented him from using a keyboard.[88]  He also submitted a Medical Opinion form that reaffirmed his earlier opinion on the extent of Mr. Hesitr's limitations.[89]

Aside from Mr. Hestir's right shoulder problems, Dr. Berry noted that Mr. Hestir suffers

---

[81]  *Id.*

[82]  Part 3 of Joint Stipulated R. (Doc. 26-3) at 75-76.

[83]  *Id.* at 76.

[84]  *Id.*

[85]  *Id.*

[86]  *Id.* at 75-76.

[87]  Part 11 of Joint Stipulated R. (Doc. 26-11) at 26.

[88]  *Id.*

[89]  *Id.* at 27-30.

from secondary diagnoses of chronic low blood pressure, left arm weakness, chronic left arm pain, and hand cramps.[90]  He further noted that Mr. Hestir has chronic low back pain, neck pain, knee pain and tenderness, tremors, muscle spasms, and left hand finger amputations.[91]  Medical records also indicate that Mr. Hestir suffers from bipolar II disorder, depression with anxiety, low testosterone, and obstructive sleep apnea.[92]  But, for the most part, Dr. Berry considered all of these secondary conditions to be "stable."[93]  And until Mr. Hestir re-injured his shoulder, he was able to hold a steady job despite his health conditions.

Although the record offers little information on the majority of Mr. Hestir's chronic conditions, Mr. Hestir was seen for his tremors on two occasions by Neurologist Christopher Wright.  The first appointment was on December 5, 2016.[94]  Dr. Wright noted that Mr. Hestir displayed no acute distress.[95]  Dr. Wright prescribed Mr. Hestir "a low dose" (60 mg) of Inderal LA and recommended that Mr. Hestir "practice healthy food and diet routine and exercise." [96]  On January 30, 2017, Mr. Hestir returned to Dr. Wright for a follow-up appointment.[97]  Mr. Hestir reported that his tremor was "somewhat better," but he still had difficulty typing.[98]  Dr. Wright slightly increased Mr. Hestir's dose of Inderal LA and instructed Mr. Hestir to simply continue the medication as directed and to continue to "practice healthy food and diet routine and exercise."[99]

---

[90]  Part 3 of Joint Stipulated R. (Doc. 26-3) at 75.

[91]  *Id.*

[92]  Part 15 of Joint Stipulated R. (Doc. 26-15) at 47-48.

[93]  *Id.* at 47.

[94]  Part 6 of Joint Stipulated R. (Doc. 26-6) at 83.

[95]  *Id.* at 86.

[96]  *Id.* at 87.

[97]  Part 7 of Joint Stipulated R. (Doc. 26-7) at 61.

[98]  *Id.*

[99]  *Id.* at 63.

As far as the record reveals, Mr. Hestir never met with Dr. Wright again.

Finally, in Mr. Hestir's own words, a typical day living with his injury includes showering, shaving, brushing his teeth, getting dressed, doing "PT when able," eating, reading, watching movies and the news, napping and resting, visiting with family, talking on the phone with friends, and attending regular doctor appointments.[100]  Mr. Hestir also occasionally goes shopping, he goes outside roughly four times a week, routinely eats lunch with friends, and races large-scale remote control cars.[101]  But Mr. Hestir can no longer shoot for sport or repair his remote control cars.[102]  Mr. Hestir claims that he can lift ten to twenty pounds using his hands.[103]

### III.    Mr. Hestir's Claim and USAble's Decisions

There is no dispute that Mr. Hestir participated in a group long-term disability plan issued by USAble.  And for the most part, the parties do not dispute the interpretation of the terms within the Plan. The Plan became effective on January 1, 2011 and was renewed on January 1, 2012.[104]  As is relevant to Mr. Hestir's claim for benefits, a person is disabled under the terms of the Plan when:

> During the elimination period the first 24 months and of a period of disability, an injury, sickness, or pregnancy requires that you be under the regular care of a physician, and prevents you from performing all of the material duties of your regular occupation with reasonable accommodations.[105]

The Plan defines an "injury" as an "accidental bodily injury."[106]  The Plan defines "material duties"

---

[100] Part 2 of Joint Stipulated R. (Doc. 26-2) at 46.

[101] *Id.* at 49-50; *Id.* at 5; Part 17 of Joint Stipulated R. (Doc. 26-17) at 4.

[102] Part 2 of Joint Stipulated R. (Doc. 26-2) at 50; Part 17 of Joint Stipulated R. (Doc. 26-17) at 4.

[103] Part 2 of Joint Stipulated R. (Doc. 26-2) at 51.

[104] Part 3 of Joint Stipulated R. (Doc. 26-3) at 6, 19.

[105] *Id.* at 20.

[106] *Id.* at 22.

as the "sets of tasks or skills required generally by employers from those engaged" in a given occupation.[107]  And the Plan defines a "regular occupation" as "the occupation in which you were working immediately prior to becoming disabled."[108]  By the terms of the Plan, USAble enjoys "the sole discretionary authority to determine eligibility for participation or benefits and to interpret the terms of the policy."[109]  USAble decides "(a) if a covered person is eligible for this insurance; (b) if a covered person meets the requirements for benefits to be paid; and (c) what benefits are to be paid by the policy."[110]

As noted above, Mr. Hestir filed his claim for long-term disability in December 2016 due to an injury to his right shoulder.  On March 6, 2017, Mr. Hestir's claim was denied by Senior Case Manager Tracy Dougherty.[111]  Ms. Dougherty's decision was based predominantly on the opinions of Dr. Collins and Ms. Marques.[112]  She also noted that Dr. Wright took a very conservative approach to treating Mr. Hestir's tremors, and that Dr. Berry's medical notes indicated that Mr. Hestir's chronic back pain was under control.[113]  The report also indicated that an Independent Medical Consultant—Linda Waterman, RN, BSN—reviewed Mr. Hestir's medical records and opined that Mr. Hestir's "back pain would not rise to a level that would be expected to preclude [him] from sustained sedentary activity."[114]  Finally, the decision noted that Mr. Hestir was still racing remote control cars despite his claim that he could not use a keyboard or mouse.[115]

---

[107]  *Id.*

[108]  *Id.* at 24.

[109]  *Id.* at 29.

[110]  *Id.*

[111]  Part 1 of Joint Stipulated R. (Doc. 26-1) at 22.

[112]  *Id.* at 23-24.

[113]  *Id.*

[114]  *Id.* at 23; *Id.* at 18.

[115]  *Id.* at 23.

Mr. Hestir appealed.

On January 18, 2018, the USAble "Appeals Unit" issued an opinion affirming the denial of Mr. Hestir's claim.[116]   In reaching this determination, USAble "reconsidered all of the information previously submitted, as well as new documentation and re-evaluated Mr. Hestir's claim in its totality."[117]   In particular, USAble obtained additional medical records and additional information from Mr. Hestir's employer.[118]   Mr. Hestir also provided USAble with a copy of his Social Security Disability file.[119]   The Appeals Unit's decision discussed Mr. Hestir's medical records in great detail.   It also consulted with a second Independent Medical Consultant, Nurse Kristin Fielding.[120]   The Appeals Unit allocated considerable weight to Nurse Fielding's conclusions.

Nurse Fielding reviewed Mr. Hestir's claim in its entirety.[121]   Like Nurse Waterman, Nurse Fielding agreed with Dr. Collins's Attending Physician's Statement.[122]   But Nurse Fielding did not agree with Dr. Collins's restriction on kneeling and crouching based on the medical information provided.[123]   And she discounted Dr. Berry's opinion that Mr. Hestir could not perform sustained sedentary work because his opinion was not supported by any "rationale or further medical documentation."[124]   As it relates to Mr. Hestir's tremors, Nurse Fielding noted that Mr. Hestir only

---

[116]  Part 5 of Joint Stipulated R. (Doc. 26-5) at 16.

[117]  *Id.* at 18.

[118]  *Id.* at 18-23.

[119]  *Id.*  The parties agree that Mr. Hestir was awarded Social Security Disability benefits.  The Joint Stipulated Record does not contain any formal Social Security determination or decision.  It appears that no such written, reasoned decision exists.

[120]  *Id.* at 18.

[121]  *Id.*

[122]  *Id.* at 19.

[123]  *Id.*

[124]  *Id.*

visited Dr. Wright twice, and that Dr. Wright did not limit or restrict Mr. Hestir in any capacity.[125]

Nurse Fielding found that most of Mr. Hestir's chronic conditions—back pain, left arm weakness, two finger amputations, wrist fusion and left elbow/forearm reconstruction, knee and cervical spine issues, and mental health issues—were in stable condition.[126]  She reasoned that none of these conditions would keep Mr. Hestir from sedentary work because none of these issues precluded him from working in the past, and because none of these issues had significantly changed since Mr. Hestir stopped working.[127]

The Appeals Unit also gave significant weight to Vocational Consultant Ms. Marques's assessment.[128]  And it explained that Mr. Hestir's "Social Security Disability award" did not alter its determination because the Social Security Disability file did not include a "determination and assessment of Mr. Hestir's Residual Functional Capacity."[129]  Once again, Mr. Hestir appealed.

On April 18, 2018, USAble reaffirmed its decision to deny Mr. Hestir's claim.[130]  This time, Mr. Hestir's appeal was handled by Senior Appeals Consultant Lindsay Neithercut.[131]  As was the case in the first appeal, Ms. Neithercut "reconsidered all of the information previously submitted, as well as new documentation and re-evaluated Mr. Hestir's claim in its totality."[132]  Mr. Hestir submitted the opinion of his Vocational Specialist, Mr. White.[133]  Ms. Neithercut disagreed with Mr. White's assessment.  She explained that Mr. White applied Social Security

---

[125] *Id.* at 20.

[126] *Id.* at 20-22.

[127] *Id.*

[128] *Id.* at 22-23.

[129] *Id.* at 23.

[130] Part 11 of Joint Stipulated R. (Doc. 26-11) at 4.

[131] *Id.* at 7.

[132] *Id.* at 5.

[133] *Id.*

standards in his assessment, and that such standards are not controlling in determining whether Mr. Hestir is entitled to long-term disability benefits under the terms of his specific Plan.[134]  She also noted that Mr. White heavily relied upon Dr. Berry's opinion.[135]  Like those who reviewed the claim before her, Ms. Neithercut did not place much stock in Dr. Berry's opinion, instead deferring to the opinions of Dr. Collins, Nurse Fielding, and Vocational Consultant Ms. Marques.[136]  Finally, Ms. Neithercut explained that the award of Social Security benefits was not persuasive because it did not include a determination or assessment of Mr. Hestir's residual functional capacity.[137]  Having exhausted his administrative remedies, Mr. Hestir filed suit in this Court under 29 U.S.C. § 1132.

## STANDARD OF REVIEW

The parties disagree as to which standard of review the Court should apply.  Generally, "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard . . . ."[138]  But when "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan,"[139] "a court should review the plan administrator's decision only for abuse of discretion."[140]  The Plan here specifically states that USAble enjoys "the sole discretionary authority to determine eligibility for participation or benefits and to interpret the terms of the policy."[141]  Not surprisingly, USAble asserts that the

---

[134] *Id.* at 5-6.

[135] *Id.* at 6.

[136] *Id.*

[137] *Id.* at 7.

[138] *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

[139] *Id.*

[140] *Buttram v. Cent. States, Se. & Sw. Areas Health & Welfare Fund*, 76 F.3d 896, 899 (8th Cir. 1996).

[141] Part 3 of Joint Stipulated R. (Doc. 26-3) at 29.

Court should apply an abuse of discretion standard because the Plan clearly includes a discretionary clause.  Mr. Hestir does not dispute that the Plan includes a discretionary clause. Instead, Mr. Hestir asserts that Arkansas law governs this dispute and Arkansas law prohibits the use of discretionary clauses in disability income policies.

The terms of the Plan plainly state that Arkansas law controls the policy in this case.[142] And "[w]here a choice of law is made by an ERISA contract," the choice of law should be followed when it is "applicable and not otherwise governed by federal ERISA law," and when the choice of law is not "unreasonable or fundamentally unfair."[143]  Neither party here contends that the application of Arkansas law would be unreasonable or fundamentally unfair.  And the Eighth Circuit has indicated that state statutes or regulations that prohibit the use of discretionary clauses are not preempted by federal ERISA laws.[144]  Thus, to the extent that it is applicable, Arkansas law governs the discretionary clause in this case.

## I.     The Discretionary Clause

Mr. Hestir asserts that Rule 101 of the Arkansas Insurance Commission prohibits the discretionary clause in this case.  Rule 101 states that

> [n]o policy, contract, certificate or agreement offered or issued in this State providing for disability income protection coverage may contain a provision purporting to reserve discretion to the insurer to interpret the terms of the contract, or to provide standards of interpretation or review that are inconsistent with the laws of this State.[145]

In other words, an eligibility decision is not entitled to deference when the insurer is interpreting

---

[142] The Plan states that "[t]he laws of the state where [the plan] is delivered govern this policy."  *Id.* at 12.  The Plan designates Arkansas as the state of delivery.  *Id.* at 6.

[143] *Brake v. Hutchinson Tech. Inc. Grp. Disability Income Ins. Plan*, 774 F.3d 1193, 1197 (8th Cir. 2014).

[144] *Id.* at 1196 ("Although ERISA preemption is generally broad, state statutes or regulations that regulate insurance are 'saved' from preemption under 29 U.S.C. § 1144(b)(2)(A).").

[145] CODE ARK. R. 054.00.101-4.

the terms of its own contract to determine whether it must pay a claimant.[146]  USAble contends that Rule 101 has no application to the discretionary clause in the instant case because Rule 101 only applies to "disability income policies issued in [Arkansas] which [were] issued or renewed on and after March 1, 2013."[147]  USAble is correct.  The Plan in this case became effective on January 1, 2011 and was renewed on January 1, 2012.[148]  Thus, the Plan here was neither issued nor renewed when Rule 101 took effect.

Mr. Hestir argues that his Plan was annually renewed on its anniversary date, which was January 1, 2011 and each succeeding January 1.[149]  He reasons that because his Policy was effective on January 1, 2015, the Plan was necessarily renewed after March 1, 2013.[150]  An identical argument was offered and rejected in *Roebuck v. USAble Life*.[151]  Just like the Plan in this case, the policy in *Roebuck* became effective on January 1, 2011, was renewed on January 1, 2012, and contained an anniversary date of January 1, 2011 and each succeeding January 1.  But there was nothing in the language of the policy in *Roebuck* that indicated that "the policy renews every year on January 1."  Accordingly, the court "decline[d] to assume—without any basis in the record evidence—that the anniversary date [was] also a renewal date."  In reaching this determination, the court noted that "[o]ther district courts that have examined this issue have found that the anniversary date of a policy is not a 'renewal' of that policy under Rule 101."[152]

---

[146]  *See Davis v. Unum Life Ins. Co. of Am.*, No. 4:14-CV-00640-KGB, 2016 WL 1118258, at *2-3 (E.D. Ark. Mar. 22, 2016) (explaining the development of discretionary clauses and the subsequent backlash).

[147]  CODE ARK. R. 054.00.101-7.

[148]  Part 3 of Joint Stipulated R. (Doc. 26-3) at 6, 19.

[149]  *Id.* at 6.

[150]  Pl.'s Reply (Doc. 36) at 2.

[151]  *Roebuck v. USAble Life*, 380 F. Supp. 3d 852, 863 (E.D. Ark. 2019).

[152]  *Id.* ("*See Price v. Tyson Long-Term Disability Plan, Case No. 5:16-cv-05075*, 2017 WL 3567531, at *3-4 (W.D. Ark. Aug. 17, 2017) (holding that the anniversary date of a policy is not a renewal within the meaning of Rule 101); *Owens v. Liberty Life Assurance Co. of Boston*, 184 F.Supp.3d 580, 585 (W.D. Ky. 2016) (same); *Rogers v. Reliance Standard Life Ins. Co.*, 14 C 4029, 2015 WL 2148406 (N.D. Ill. May 6, 2015) (holding that [an]

Although *Roebuck* is not binding precedent, the Court agrees with its ruling. There is nothing in the record in this case that supports Mr. Hestir's assertion that the Plan's anniversary date should also be construed as a renewal date. In fact, Mr. Hestir admits that the face of the Plan does not support his argument.[153] Mr. Hestir only "*suspects* the Plan in question has been renewed on an annual basis" on the anniversary date.[154] Without more than speculation, the Court declines to assume that the Plan's anniversary date was also a renewal date. The Plan in this case was issued on January 1, 2011 and was renewed *once* on January 1, 2012. Consequently, Rule 101 does not apply to the Plan, the discretionary clause is valid, and USAble's decision is afforded deference under the abuse of discretion standard.

## II.      Abuse of Discretion Standard

Under the abuse of discretion standard, USAble's decision will be upheld so long as the decision was reasonable. A decision is reasonable if it is supported by substantial evidence, which is "more than a scintilla, but less than a preponderance, of evidence."[155] Given this "[r]estrictive standard of review" the Court is "not permit[ed] to 'weigh the evidence anew' and render its own decision."[156] Rather, "[i]f substantial evidence supports the decision, it should not be disturbed even if a different, reasonable interpretation could have been made."[157]

The Court will not merely rubberstamp USAble's decision. In fact, the Court may apply a

---

[153] anniversary date did not qualify as a renewal date under a similar Texas regulation[].") (internal quotations omitted); *see also Price v. Tyson Long-Term Disability Plan*, No. 5:16-CV-05075, 2017 WL 3567531, at *4 (W.D. Ark. Aug. 17, 2017) ("The Court finds that the Plan's anniversary date exists for purposes of designating each plan year's annual enrollment period and does not equate to an annual renewal of the policy.").

[153] Pl.'s Reply (Doc. 36) at 2.

[154] *Id.*

[155] *Sepulveda-Rodriguez v. MetLife Grp., Inc.*, 936 F.3d 723, 729 (8th Cir. 2019) (citing *Johnson v. United of Omaha Life Ins. Co.*, 775 F.3d 983, 989 (8th Cir. 2014)).

[156] *Id.*

[157] *Id.* (citing *Johnson*, 775 F.3d at 989).

"less deferential" review to USAble's decision because USAble "both determines and pays claims."[158]   The Eighth Circuit recently clarified, however, that "less deferential" means nothing more than "taking [the conflict of interest] into consideration" while applying the abuse of discretion standard.[159]   In other words, the review is less deferential only insofar as a conflict is considered as an additional factor when a conflict exists.   The Supreme Court has likewise explained that "conflicts are but one factor among many that a reviewing judge must take into account."[160]   The greater the conflict, the greater the weight accorded to that particular factor, and vice versa.

Here, a conflict of interest exists because USAble holds the dual role of evaluating and paying benefits claims.[161]   But Mr. Hestir has not alleged any facts or made any arguments to suggest that USAble's dual participation should significantly weigh against its decision.   And nothing in the record suggests USAble has a "history of biased claims administration,"[162] or that "the medical professionals who reviewed the claim for benefits were employed" by USAble or were compensated based on their findings.[163]   To the contrary, the record demonstrates that USAble has taken at least some steps to reduce the risk that a conflict would affect its eligibility determination in this case.   For example, Mr. Hestir's claims were reviewed and considered by a different decisionmaker at each step in the decision making process.   And at each step, Mr. Hestir's

---

[158] *McIntyre v. Reliance Standard Life Ins. Co.*, No. 19-2367, 2020 WL 4951028, at *6 (8th Cir. Aug. 25, 2020) (clarifying prior precedent and explaining that, while a conflict of interest warrants a "less deferential abuse of discretion standard," it does not open "a gateway to de novo review or some other heighted form of review other than an abuse of discretion").

[159] *McIntyre*, 2020 WL 4951028, at *6.

[160] *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 116 (2008).

[161] *Manning v. Am. Republic Ins. Co.*, 604 F.3d 1030, 1038 (8th Cir. 2010).

[162] *Id.*

[163] *Cooper v. Metro. Life Ins. Co.*, 862 F.3d 654, 661 (8th Cir. 2017).

claim was reconsidered "in its totality."  Additionally, USAble hired two different *Independent Medical Consultants* to consider Mr. Hestir's claim.  Thus, while a conflict does superficially exist, the conflict is not allotted "substantial weight" given the particular circumstances of this case.[164]

## ANALYSIS

Mr. Hestir argues that USAble's decision should be reversed because he "meets the Plan definition of disability and USAble ignored evidence which supported his claim."[165]  According to the terms of the Plan, a claimant is disabled if an injury or sickness prevents the claimant "from performing all of the material duties of [the claimant's] regular occupation with reasonable accommodations."  Although there is also a duration requirement, that issue is not disputed by the parties.  Thus, given the standard of review, the question the Court must answer is whether it was reasonable for USAble to conclude that Mr. Hestir *can* perform the material duties of his regular occupation despite his injuries and/or illnesses.[166]

As set forth above, Mr. Hestir was working as an Analyst III immediately prior to his alleged date of disability.  Both Vocational Consultant Ms. Marques and Vocational Specialist Mr. White determined that an Analyst III is most similar to a Systems Analyst under the DOT.  A Systems Analyst is a sedentary position.  Thus, to do the work of an Analyst III, Mr. Hestir must be able to perform sedentary work.  Mr. Hestir must be able to primarily sit, frequently finger (type) and handle, and occasionally walk, stand, reach at "desk level/arm's length," and

---

[164] *Manning*, 604 F.3d at 1038.  Although Mr. Hestir notes that "procedural irregularities are another factor" for the Court's consideration, he does not argue that there were any procedural irregulates in this case.  Pl.'s Br. and Mot. for J. on the R. (Doc. 30) at 6.  The Court has not any.

[165] *Id.* at 8.

[166] Although the parties dispute the significance of Mr. Hestir's "secondary health conditions," it is clear from the record that USAble considered all of Mr. Hestir's ailments and injuries when deciding his claim, not just his shoulder injury.  USAble's eligibility determinations considered and discussed these conditions.

"lift/carry/push/pull up to 10lbs."[167]  These conclusions are consistent with the job descriptions of both Mr. Hestir and his supervisor.  Indeed, Mr. Hestir's supervisor indicated that an Analyst III's work consists of eighty-percent typing and twenty-percent answering calls.

Substantial evidence supports USAble's conclusion that Mr. Hestir can perform the material duties of his sedentary job.  In particular, USAble's decision is supported by the medical opinion of Dr. Collins, Mr. Hestir's orthopedic surgeon.  Dr. Collins indicated that Mr. Hestir had no restrictions against sitting, standing, or walking for eight hours a day.  He further opined that Mr. Hestir had no restrictions against lifting up to ten pounds with either arm, but that Mr. Hestir could never reach above the shoulder with his right arm and only occasionally reach below the shoulder with his right arm.  Dr. Collins stated that Mr. Hestir had no limitations fingering (typing) or handling with either hand, and he opined that Mr. Hestir was improving.  Although Dr. Collins cautioned against "significant bimanual activities with the arms away from the body," he suggested that work with a "keyboard or mouse" paired well with Mr. Hestir's capabilities.[168]

USAble's decision is further supported by the expert opinions of Vocational Consultant Ms. Marques and both of the Independent Medical Consultants that reviewed Mr. Hestir's file.  With respect to Mr. Hestir's tremors, USAble reasonably concluded that they were not sufficiently severe to keep him from working given Dr. Wright's conclusions and conservative treatment approach.  And even Dr. Berry's records reported that most of Mr. Hestir's chronic conditions were in stable condition.  Finally, USAble repeatedly stated that it evaluated Mr. Hestir's claim in its totality.  This means that each decision evaluated and considered Mr. Hestir's marked

---

[167] Part 2 of Joint Stipulated R. (Doc. 26-2) at 4.  Ms. Marques suggested that a standing or adjustable workstation and keyboard would be a reasonable accommodation for an Analyst III.

[168] Part 1 of Joint Stipulated R. (Doc. 26-1) at 73.

improvement during physical therapy.[169]  Certainly, Mr. Hestir's report that he was "very active .

. . caring for his brother's animals," and that he was able to carry "large bags of food and buckets

of water," supports USAble's determination that Mr. Hestir can perform sedentary work.[170]

Although Dr. Berry presented a very different opinion on Mr. Hestir's capabilities, USAble

was "not obligated to accord" him any special deference.[171]  Where there is "a conflict of opinion"

between medical professionals, "the plan administrator has discretion to deny benefits unless the

record does not support denial."[172]  Thus, USAble was justified in relying on the opinions of Dr.

Collins, Nurse Fielding, Nurse Waterman, and Vocational Consultant Ms. Marques, over the

opinions of Dr. Berry and Vocational Specialist Mr. White.  In fact, the Court finds Dr. Berry's

extreme conclusions to be incredible.  For example, Dr. Berry suggests that Mr. Hestir cannot sit

for more than two hours a day, and he cannot stand or walk for more than one hour a day.  In other

words, Dr. Berry seems to be suggesting that Mr. Hestir must be laying down for twenty hours a

day.

Dr. Berry's assessment appears entirely inconsistent with Mr. Hestir's own description of

his typical day, which includes showering, shaving, brushing his teeth, getting dressed, doing "PT

when able," eating, reading, watching movies and the news, napping and resting, visiting with

family, talking on the phone with friends, and attending regular doctor appointments.[173]  Mr. Hestir

---

[169] The fact that the therapy reports were not cited in the denial letters "is immaterial" because they were "in the materials" that USAble considered in reaching its determination.  *Leirer v. Proctor & Gamble Disability Benefit Plan*, 910 F.3d 392, 398 (8th Cir. 2018).

[170] Part 5 of Joint Stipulated R. (Doc. 26-5) at 94.

[171] *Cooper*, 862 F.3d at 662.  "ERISA affords courts 'no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.'" *Weidner v. Fed. Exp. Corp.*, 492 F.3d 925, 930 (8th Cir. 2007) (quoting *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)).

[172] *Id.*

[173] Part 2 of Joint Stipulated R. (Doc. 26-2) at 46.

also indicated that he goes shopping, goes outside four times a week, routinely eats lunch with friends, and races large-scale remote control cars.  During therapy, Mr. Hestir revealed that he was "very active" caring for his brother's pets.  And only a few weeks after his surgery, Mr. Hestir was able to travel to Heber Springs, which is over an hour away from his residence in North Little Rock.  Finally, even Dr. Wright instructed Mr. Hestir to exercise.[174]   All of this evidence undermines the credibility of Dr. Berry's suggestion that Mr. Hestir is effectively bedridden by his conditions.

Nevertheless, Mr. Hestir contends that he cannot perform the material functions of his job, and that his job cannot be modified to accommodate his disability.  But rather than explain why USAble's determination was not supported by substantial evidence, Mr. Hestir focuses on the "evidence which supports his claim."  In particular, Mr. Hestir asserts that a finding of disabled would have been reasonable based on (1) his supervisor's letter, (2) his approval for Social Security Disability, and (3) "his own vocational expert['s]" opinion.[175]   These arguments are largely misdirected given the standard of review.  Indeed, "[i]f substantial evidence supports the decision, it should not be disturbed *even if a different, reasonable interpretation could have been made*."[176] The fact that a different, reasonable interpretation could have been made in Mr. Hestir's case does not directly speak to whether the actual decision was unreasonable.

To the extent these arguments indirectly relate to the standard of review, they are unpersuasive.[177]   For example, the letter from Mr. Hestir's supervisor does nothing to undermine

---

[174] *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (stating that, at least in the Social Security Disability context, "a physician's unrestricted recommendations to increase physical exercise are inconsistent with a claim of physical limitations"); *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (reasoning that a physician's recommendation to exercise suggests that a claimant has an increased functional capacity).

[175] Pl.'s Br. and Mot. for J. on the R. (Doc. 30) at 8-11.

[176] *Sepulveda-Rodriguez*, 936 F.3d at 729 (citing *Johnson*, 775 F.3d at 989) (emphasis added).

[177] To the extent that Mr. Hestir is saying that USAble entirely ignored relevant evidence—which would constitute

USAble's reasonable reliance on the opinions of Dr. Collins, Nurse Waterman, Nurse Fielding, and Vocational Consultant Ms. Marques.  USAble considered the supervisor's letter in reviewing Mr. Hestir's second appeal.  And aside from the supervisor's ultimate opinion on Mr. Hestir's capacity to work, USAble's assessment of the Analyst III position was largely consistent with the supervisor's description.[178]

As it relates to Mr. Hestir's award of Social Security benefits, the Eighth Circuit has been clear that Social Security "disability awards are not binding on ERISA plan administrators."[179]  Instead, an award of Social Security benefits is considered relevant evidence in the ERISA analysis.[180]  It is undisputed that USAble acknowledged and weighed Mr. Hestir's Social Security award in both his first and second appeals.  In the first appeal, USAble incorporated the results from Mr. Hestir's Social Security IME into its decision.  USAble expressly stated that it considered the Social Security determination in its analysis, but that the award of benefits did not sway USAble's decision because the Social Security file did not include a determination and assessment of Mr. Hestir's residual functional capacity.  In the second appeal, USAble again noted that it reviewed Mr. Hestir's Social Security Disability file.  And once again, USAble explained that the Social Security determination did not tip the scale in Mr. Hestir's favor because the file did not

---

an abuse of discretion—that is not the case.  The record demonstrates that USAble considered all of the relevant evidence in reaching its decision.

[178]  *Compare* Part 8 of Joint Stipulated R. (Doc. 26-8) at 32, 38, *with* Part 1 of Joint Stipulated R. (Doc. 26-1) at 23, Part 5 of Joint Stipulated R. (Doc. 26-5) at 18, 22-23, *and* Part 11 of Joint Stipulated R. (Doc. 26-11) at 6.

[179]  *Waldoch v. Medtronic, Inc.*, 757 F.3d 822, 833 (8th Cir. 2014), as corrected (July 15, 2014); *see also Farfalla v. Mut. of Omaha Ins. Co.*, 324 F.3d 971, 975 (8th Cir. 2003) (stating that "an ERISA plan administrator or fiduciary generally is not bound by an SSA determination that a plan participant is disabled, even when the plan's definition of disabled is similar to the definition the SSA applied") (internal quotations omitted); *Jackson v. Metro. Life Ins. Co.*, 303 F.3d 884, 889 (8th Cir. 2002) (holding that the plan administrator was "not bound by a SSA determination" despite the fact that "the Plan's definition of 'disabled' [was] similar to the definition the SSA supplied" because the definitions were not identical and because there was no indication that the SSA decision was based on a review of "the same record that was before" the plan administrator).

[180]  *Waldoch*, 757 F.3d at 833.

include a determination and assessment of Mr. Hestir's residual functional capacity.  USAble reasoned that without that information, it was unable to determine the basis for the Social Security award.

Finally, USAble discussed Mr. Hesitr's Vocational Specialist's opinion at length in its second appeal decision.  The decision noted that Mr. White applied Social Security standards in forming his conclusions, and that Mr. White heavily relied upon Dr. Berry's unsupported opinion that Mr. Hestir could not perform sustained sedentary-level activity.  USAble did not err in deferring to the expert opinions of Dr. Collins, Nurse Waterman, Nurse Fielding, and Vocational Consultant Ms. Marques.  Indeed, the Eighth Circuit has held that it is not an abuse of discretion for an insurer to rely on its own experts over the claimant's evidence.[181]

Mr. Hestir has not shown that USAble ignored relevant evidence.  None of Mr. Hestir's remaining arguments are persuasive.[182]  Based on the Joint Stipulated Record, the Court concludes that USAble's decision to deny Mr. Hestir's claim for benefits was reasonable because it is supported by substantial evidence.  Accordingly, USAble did not abuse its discretion in denying Mr. Hestir's claim for benefits.

---

[181] *Gerhardt v. Liberty Life Assur. Co. of Bos.*, 736 F.3d 777, 781 (8th Cir. 2013); *see also Leirer*, 910 F.3d at 398 (citing *Gerhardt*, 736 F.3d at 781).

[182] Mr. Hestir briefly argues that USAble could have obtained a functional capacity exam ("FCE"), that USAble's reason for denial changed with each of its subsequent reviews, and that Mr. Hestir's "20-pound lifting requirement" should have resulted in a "light" job classification.  With respect to the FCE, the Plan clearly states that the burden is on the policy holder to prove his disability, not the other way around.  Part 3 of Joint Stipulated R. (Doc. 26-3) at 29.  Mr. Hestir does not cite any law suggesting that USAble was required to conduct an FCE.  And even when a FCE is available, a plan administrator does not abuse its discretion in denying a claim when there is a lack of objective evidence of a disability in the record.  *Parkman v. Prudential Ins. Co. of Am.*, 439 F.3d 767, 773 (8th Cir. 2006).  Additionally, the fact that each review found different grounds for denial is not a point for reversal.  To the contrary, because each decision was supported by substantial evidence, the variation provides all the more reason to conclude denial was reasonable.  Finally, even Mr. Hestir's own vocational specialist agreed that his job was sedentary in nature.

## CONCLUSION

For all of the reasons stated above, Mr. Hestir's Brief and Motion for Judgment on the Record is DENIED with prejudice.  For the same reasons, USAble Life's Counter Motion for Judgment on the Record is GRANTED.  Judgment will be entered in favor of USAble Life.

IT IS SO ORDERED this 30th day of September 2020.

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE